## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

KAREN M. KEESECKER,

       Plaintiff,                      CASE NO. 03-CV-10039-BC

v.                               DISTRICT JUDGE DAVID M. LAWSON
                               MAGISTRATE JUDGE CHARLES BINDER

MIDLAND COUNTY
EDUCATIONAL SERVICE
AGENCY,

       Defendant.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
## ON MIDLAND COUNTY EDUCATIONAL SERVICE AGENCY'S
## MOTION FOR SUMMARY JUDGMENT
(Dkt. 62)

## I.    RECOMMENDATION

**IT IS RECOMMENDED** that Defendant Midland County Educational Service Agency's

Motion for Summary Judgment be **DENIED**.

## II.    REPORT

### A.    Introduction

Pending, pursuant to an Order of Reference from United States District Judge David

Lawson for all pretrial proceedings (Dkt. 2), is the above-entitled motion. Plaintiff filed a response

opposing the motion (Dkt. 70), and thereafter, Plaintiff filed an additional exhibit in support of

her response (Dkt. 71). After the approval of a stipulation by the parties (Dkt. 69), Defendant filed

its reply (Dkt. 72). Oral argument was heard September 22, 2004, and this motion is now ready

for Report and Recommendation.

### B.    Background

Plaintiff filed her complaint on February 11, 2003, alleging that her rights under Title VII of the Civil Rights Act of 1984 were violated by her employer, Defendant Midland County Educational Services Agency (hereinafter "MCESA").  Plaintiff asserts that she was hired as a school social worker in 1990 and wrongfully terminated on June 30, 2002.  (Compl., Dkt. 1, ¶ 8.) Plaintiff bases her claim on age discrimination (*id*. ¶¶ 22-33), and alleges that all reasons given for her termination were "pretextual in nature."  (*Id*. ¶ 24.)  In an amended complaint filed June 26, 2003, Plaintiff restates her claim as one based upon violation of the Age Discrimination and Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*.  (Dkt. 23.)

Defendant filed answers to both the original and amended complaints (Dkts. 10 & 24), denying the substantive allegations contained therein.  Defendant also raised affirmative defenses that Plaintiff's claim is barred by various species of administrative *res judicata*, or alternatively by the "Doctrine of Governmental Immunity."  (Answer, Dkt. 24.)

### C.    Defendant's Motion for Summary Judgment

Defendant argues that it is entitled to summary judgment because Plaintiff cannot establish a prima facie case of either gender or age discrimination.[1]  Defendant asserts that Plaintiff has produced no evidence tending to show that her termination was based upon anything other than her unsatisfactory job performance.  Defendant further claims that its reasons for the employment action taken against Plaintiff were legitimate, non-discriminatory and not pretextual.  Attached to the instant motion are a series of exhibits, including excerpts of Plaintiff's deposition, as well as

---

[1]Defendant apparently interprets references made in the complaint and amended complaint to the hiring of a younger woman to be allegations of gender discrimination.  However, during oral argument, counsel for Plaintiff confirmed that this case is predicated solely upon alleged age discrimination.

various memoranda and minutes from meetings of the MCESA Board of Education, which at least in part relate to Plaintiff.

Plaintiff opposes the motion, noting that she obtained the highest level of certification for her specialty in less than two years and that for many years she received the highest rating available on her annual evaluations.   (Pl.'s Resp., Dkt. 70 at 4.)   Plaintiff maintains that Defendant's discriminatory animus is evidenced by a "relentless campaign of badgering the Plaintiff about retiring" (*id.* at 7), particularly on the part of MCESA Superintendent William McKinstry.   Attached to Plaintiff's motion are 14 exhibits, comprising deposition testimony, portions of Plaintiff's personnel records, and complaints made by Plaintiff to the U.S. Equal Employment Opportunity Commission (hereinafter "EEOC").

### 1.      Motion Standards

A motion for summary judgment will be granted under Rule 56(c) where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).   All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).   The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing *Celotex Corp. v Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).   In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88.   Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 326.

In response, the non-moving party cannot rest merely on the pleadings alone. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 191 L. Ed. 2d 202 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When the nonmoving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court will rely upon the "facts presented and designated by the moving party." *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). The Sixth Circuit explicitly instructed that it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion." *Id.* at 406.

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### 2. Age Discrimination Claim

#### a. Governing Law

"A plaintiff may establish discrimination either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination." *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997).

When using circumstantial evidence to create an inference of discrimination, the complainant must carry the initial burden of establishing by a preponderance of the evidence a prima facie case of discrimination by the employer.

In evaluating claims of employment discrimination not proven by direct evidence, federal courts employ the burden-shifting approach first announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 906 (6th Cir. 2002). However, in *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996), the Supreme Court modified the *McDonnell Douglas* framework for ADEA cases when it held that "[t]he fact that one person in the protected class has lost out to another person in the protected class is . . . irrelevant, so long as he has lost out because of his age." Thus, under the modified *McDonnell Douglas* framework, a plaintiff must establish a prima facie case by showing that: (1) she was at least forty years old at the time of the alleged discrimination; (2) she was subjected to an adverse employment action; (3) she was "otherwise qualified for her position"; and (4) she was replaced "by someone substantially younger." *Bush v. Dictaphone Corp.*, 161 F.3d 363, 368 (6th Cir. 1998).

A plaintiff who successfully establishes a prima facie case receives the benefit of a presumption that the employer unlawfully discriminated against him or her. *Burdine*, 450 U.S. at 254. The burden then "shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id*. at 253 (quoting *McDonnell Douglas*, 411 U.S. at 802). Finally, "should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were

not its true reasons, but were a pretext for discrimination." *Id.* Throughout this burden-shifting framework applicable when circumstantial evidence is involved, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id. See also Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995).

**b.    Evidence Presented by the Parties**

Plaintiff began her employment with Defendant as a social worker in October 1990. (Keesecker Dep., Dkt. 70, Ex 1 at 172.)[2] Plaintiff became part of a bargaining unit represented by the Midland Intermediate Federation of Teachers ("MFT/AFT") and was subject to a union contract. Plaintiff was 44 years of age at the time she began her employment. Plaintiff possesses a master's degree in social work and was a Certified Social Worker, the highest level of certification available in Michigan to one of Plaintiff's speciality. (*Id.* at 233, 236-37; *see also* Winters Dep., Dkt. 70, Ex. 2 at 30-31.)

In November 1996, Dr. William McKinstry became superintendent. (McKinstry Dep., Dkt. 70, Ex. 3 at 5.) In May 1999, Dr. Thomas Moline, the Director of Special Education Services for the MCESA, who was Plaintiff's supervisor, recommended that Plaintiff's position be reduced from full time to one-half time. The MCESA Board of Education approved this recommendation on June 15, 1999. (Keesecker Dep. at 120, 173.)

In the early months of 2000, Dr. Moline recommended that Plaintiff's position continue at half time during the next school year. McKinstry requested Plaintiff's response. (*Id.* at 151-52.) Shortly thereafter, Plaintiff apparently contacted a professional organization of which she was a member and discussed the matter with a regional president. Plaintiff was asked by a regional

---

[2]Excerpts of this same deposition also appear at Exhibit C to the instant motion. (Dkt. 62.)

6

representative to place her concerns in writing, and apparently the professional organization sent correspondence to various employees of Defendant. (*Id*. at 154.) Plaintiff responded to the request by authoring a document stating that MCESA services to special needs children and their families had been "brutally slashed[.]" (*Id*. at 156.) This document was written on MCESA stationary and was forwarded to Michigan Protection Advocacy Services and the Michigan Department of Education. (*Id*.)

In March 2000, Plaintiff again received a "satisfactory" job performance rating, as she had throughout her employment with the MCESA. (Perform. Rev., Dkt. 70 at Ex. 4.) In late April 2000, Plaintiff sent letters to various agencies, again on Defendant's letterhead, indicating that a lack of services was negatively impacting the school districts served by Defendant, as well as making Plaintiff's job more difficult. (Keesecker Dep. at 156.) The letters were apparently also critical of Defendant's decision to reduce Plaintiff's position to one-half time. (*Id*. at 156-60.) In May 2000, Plaintiff was issued a Written Reprimand for sending these letters. (*Id*. at 179.)

In early May 2000, Dr. McKinstry forwarded to Plaintiff an "Administrative Directive" in order to effectuate his "desire to clarify what is expected of [Plaintiff] in the future[.]" (Admin. Direct., Dkt. 62 at Ex. D.) The directive set forth explicit requirements that Plaintiff "use district resources exclusively for district purposes"; "treat [her] colleagues with dignity and respect"; refrain from using her "Internet access at work for inflammatory, abusive, or offensive communication"; recognize that it is the Board's duty under the Master Agreement to determine work assignments; and "follow Board policy[.]" (*Id*.)

In late August 2001, Plaintiff attained her 55th birthday, Defendant's minimum age for retirement. (Keesecker Dep. at 6, 70.) Plaintiff testified that, during that same month, she received a contract reinstating her position to full-time status. (*Id*. at 86; Dkt. 70, Ex. 6, ¶ 2.) According

to Plaintiff, when she mentioned this matter to the district's human resources manager, the contract, which at that time was unsigned, was taken from her and a different contract for part-time employment was issued.  (*Id*. at 86.)  The next month, Mark Moody was transferred into the position which included the supervision of Plaintiff.  Plaintiff's initial meeting with Moody occurred during the first weeks of September 2001, and Moody expressed support for upgrading Plaintiff's position to full time.  (*Id*. at 83-84, 86-88.)  Other supervisors were also supportive.  (*Id*. at 88-89; Renker Dep., Dkt. 70, Ex. 5 at 5.)  However, by late September 2001, Moody told Plaintiff that efforts to upgrade her position would be fruitless, as Superintendent McKinstry opposed the change.  Plaintiff was also informed that the requirements of her work were to be modified, that she was required to attend gym class with a student, and that she would be assigned a fixed schedule. (Keesecker Dep. at 89-90, 108-10.)  Although Plaintiff explained that the fixed schedule would cause her hardship and limit access to co-workers and students, Moody reiterated the requirement.  (*Id*. at 37-42, 59-63, 73.)

When Plaintiff approached McKinstry to discuss these new requirements, he allegedly responded that Plaintiff was old enough to retire.  (*Id*. at 65, 70.)  Thereafter, according to Plaintiff, McKinstry "commenced a relentless campaign of badgering the plaintiff about retiring[,]" which allegedly involved numerous unsolicited visits to Plaintiff's office during which McKinstry would encourage Plaintiff to retire.  (Pl.'s Resp., Dkt 70 at 7; Keesecker Dep. at 97-102, 105.)

On October 11, 2001, Plaintiff met with Moody, who at that time requested written summaries relating to student observations.  Subsequently, Plaintiff authored a memorandum to Moody stating that "[t]o date, there has not been time to complete these reports on a weekly basis. My intention was to submit a running account of services at the end of the month."  (Memo, Dkt 62 at Ex. E.)  Plaintiff maintains that Moody did not set due dates or specific parameters as to how

8

these reports were to be generated nor did he indicate that the reports were required by any individual student's IEP (Individual Educational Plan).  (Keesecker Aff., Dkt. 71.)[3]

On November 27, 2001, following another meeting with Moody, Plaintiff authored a second memorandum to Moody, reiterating her concern that no due dates or requirements were listed for these reports.  Plaintiff requested that Moody "[p]lease provide in writing the details of [his] needs."  (Memo, Dkt. 62 at Ex. F.)  Plaintiff also sought to resolve what she believed to be a "grossly inaccurate assumption," and stated that she considered statements made by Moody during an earlier meeting "about [her] professionalism to be offensive."  (*Id*.)  Plaintiff further expressed concern that "no other staff members are being held to this standard of accountability in the provision of services.  Given my time constraints, creating unnecessary reports places additional burden on my already limited resources."  (*Id*.)  Plaintiff again requested a written memorandum clarifying the requirements sought of her.

On December 4, 2001, Moody responded in writing summarizing the November 27 meeting, Plaintiff's subsequent memorandum, and laying out a series of "directives."  (Memo, Dkt. 62 at Ex. G.)  These directives included the compilation of weekly summaries regarding two students which could be delivered by hard copy or via e-mail.  The memorandum recites Moody's view that the reports at issue were mandated by the student's IEP, and stated that the "IEP team felt that these reports were crucial and appropriate to allow the student to make progress[.]"  (*Id*.)

Plaintiff maintains that she complied with all the directives given her.  (Keesecker Dep. at 190; *see also* Keesecker Aff., Dkt. 71.)  Moody, however, apparently believed that Plaintiff was failing to submit these weekly summary reports in a timely and complete fashion and met again with Plaintiff on February 5, 2002.  A memorandum dated February 6, 2002, was prepared by

---

[3]An unsigned version of this affidavit appears in Plaintiff's Exhibits.  (Dkt. 70, Ex. 6.)

9

Moody, setting specific due dates for the completion of the reports and explaining the format in which the reports were to be generated.  (Memo, Dkt. 62 at Ex. H.)

The delivery of this memorandum and Plaintiff's response to it appear to be a matter of some dispute between the parties.  Defendant maintains that "[u]pon receiving the memo, Ms. Keesecker threw it back at Mr. Moody."  (Mot., Dkt. 62 at 5.)  According to Plaintiff, "Mr. Moody never attempted to hand the memo to the plaintiff, attempting instead to throw the memo at the plaintiff across the room where it landed on the floor[.]"  (Keesecker Aff., Dkt. 71, ¶ 13.)  Plaintiff maintains that she never refused delivery of the memorandum.  (*Id*. ¶ 15.)  Moody testified that he could not recall "specific details" of the incident.  (Moody Dep. at 53.)

What appears not to be in dispute is that on February 26, 2002, Superintendent McKinstry forwarded a written reprimand to Plaintiff stating that "[y]our blatant disrespect for authority, in particular, your supervisor Mark Moody, when he attempted to deliver a memo to you in Paula Renker's office . . . will not be tolerated."  (Reprimand, Dkt. 62 at Ex. I.)  Within days, Plaintiff filed a discrimination complaint with the Detroit District Office of the EEOC.  (Dkt. 70 at Ex. 8.)  Plaintiff stated that the complaint involved "harassment in creating a hostile work environment [for] me.  I believe I have been discriminated against on the basis of age and sex with the intention of forcing me out of my employment."  (*Id*.)  The complaint concluded with her recitation of the "memo delivery" incident.

In early March 2002, Plaintiff received a response from the EEOC stating that the information she provided was not sufficient for filing a charge of discrimination.  Plaintiff was invited to arrange an appointment in order to provide additional information.

On March 15, 2002, Moody completed a Professional Level Evaluation of Plaintiff's performance and met with her to review its results.  The evaluation stated that Plaintiff's reports

10

were not being done in a timely manner as required by individual students' IEPs, and that Plaintiff was not completing monthly detailed logs of job duties or Medicaid billing forms.  (Prof. Level Eval., Dkt. 62, Ex. J at 128.)  The evaluation described workshops and other activities attended by Plaintiff, and stated that Plaintiff "has provided consistent and positive interaction with these students." (*Id*.)  The "general evaluation" comment, however, concluded: "An unsatisfactory year of performance.  See attached Notice of Professional Deficiency and Remediation Plan."  (*Id*. at 129.) Under the heading of "Interpersonal Relationships," the evaluation stated that "Karen has engaged in a number of inappropriate interactions throughout this past school year," and went on to describe the "memo delivery" incidents and other examples of "Karen's loss of self-control[.]" (*Id*.)

The remediation plan has been provided to the Court by Defendant.  (Remed. Plan, Dkt. 62 at Ex. K.)  Seven objectives are listed in the plan, as well as six procedures for obtaining the objectives.  The plan concludes by stating that, "[b]y May of 2002, Karen and her supervisor will review the performance data and the Plan and her supervisor will determine if progress has been made." (*Id*.)

On April 8, 2002, Plaintiff completed and returned to the EEOC a Harassment Questionnaire.  In the cover letter accompanying the questionnaire, Plaintiff alleged that the "harassment history at MCESA is extensive and very complex. . . . The current hostile work situation has been ongoing since September 2001."  (Har. Quest., Dkt. 70 at Ex. 9.)

On April 30, 2002, the EEOC forwarded to Superintendent McKinstry a Notice of Charge of Discrimination stating that the bases of discrimination were sex and age.  (Notice, Dkt. 70 at Ex. 10.)  Nine days later, McKinstry wrote to Plaintiff, stating that "[e]ffective immediately, you are placed on a paid administrative leave of absence pending action by the Board of Education on

my recommendation that your employment be terminated." (*Id.* at Ex. 12.) The same day, according to Plaintiff, she went to Defendant's Human Resources Department and requested to see her personnel file. Members of that department called McKinstry, who denied Plaintiff access to her file and requested that she go to his office. (Keesecker Aff. ¶¶ 23-25.) Plaintiff alleges that when she arrived at Superintendent McKinstry's office, she was notified that she was being placed on administrative leave. (*Id.* ¶ 26.)

On May 14, 2002, Moody prepared a Professional Level Evaluation Narrative Summary as set forth in the remediation plan. The narrative summary concluded as follows: "Karen continues to disregard MCESA Board policies. Recent examples would be 1) her attendance at an April AI conference without first requesting prior approval, 2) being 5-20 minutes late for her scheduled monthly meetings, and 3) being 15 minutes late in reporting to work." (Narr. Summary, Dkt. 62 at Ex. L.) The next day, Plaintiff received a memorandum and a copy of her entire personnel file from Superintendent McKinstry. He also enclosed a copy of the "charges" against her. (*Id.*) McKinstry's memo notified Plaintiff that a special board meeting was scheduled for June 3, 2002, "to consider a recommendation to terminate your employment with MCESA based on the charges." (*Id.*) The "charges" were listed by Superintendent McKinstry on MCESA stationery, following a notification to Plaintiff of his "intention to seek the termination of [her] employment[.]" (*Id.*) McKinstry listed the following "charges":

1. Failure to exhibit sufficient progress with the March 15, 2002 Remediation Plan;

2. Unprofessional and/or insubordinate conduct, including:

   a. continued disregard and disrespect for authority;

   b. Untimely submission of written requirements;

   c. Failure to meet IEP-mandated SSW service requirements;

12

      d.  Failure to follow MCESA policies and procedures;

      e.  Failure to follow directive to return keys and student files.

3.  Failure to maintain a positive and efficient work environment, including productive staff interactions.

(Charges, Dkt. 62 at Ex. L.)

The MCESA Board of Education met on June 3, 2002, to consider McKinstry's recommendation that Plaintiff be terminated. Attached to Defendant's brief are the minutes of this meeting. (Minutes, Dkt. 70 at Ex. M.) The minutes reflect that Plaintiff was present with a union representative. After a recitation of the charges and the recommendation of McKinstry, Plaintiff and her representative were given an opportunity to speak. The union representative stated that at least one of the charges should be "waived," as the matter had previously been dealt with. Superintendent McKinstry agreed that this particular matter had been resolved. Plaintiff then spoke, denying all charges and presenting the Board with a written prepared statement. After what is described as lengthy discussion, a motion was made to discharge Plaintiff effective June 30, 2002, the end of her contract year, and to retain Plaintiff on paid administrative leave until that date. The seven board members present voted unanimously in favor of the motion. (*Id*. at 3.)

Plaintiff alleges that after her dismissal, Jody Winters, who was 32 years old at the time, was hired as her replacement. (Pl.'s Br. in Opp. to Mot., Dkt. 70 at 12.) Plaintiff points to Winters' deposition, where Winters testified that she was hired as a full-time employee. (*Id*.; Winters Dep., Dkt. 70, Ex. 2 at 6, 11-13.) Plaintiff also points out that Winters testified that she had the lowest State of Michigan social work certification, that of a social work technician. (Winters Dep. at 29-31.) Moreover, Winters stated that she was given the discretion to change her schedule as needed and that she was never denied a request to change her working hours because

of scheduling necessities.  (*Id.* at 21-24.)  Defendant disputes the allegation that Winters filled Plaintiff's position, contending that in fact an older person was hired to replace Plaintiff.  (Def.'s Reply, Dkt. 72 at 2.)

On November 20, 2002, the EEOC forwarded to Plaintiff a "Dismissal and Notice of Rights."  This document contains the following determination:

> Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

(EEOC Notice, Dkt. 62 at Ex. N.)

The instant lawsuit commenced February 11, 2003.

### c.  Analysis

### i.  Direct Evidence

Pointing to the "relentless campaign of badgering the Plaintiff about retiring" (Pl.'s Resp., Dkt. 70 at 7), Plaintiff argues that considerable direct evidence supports her claim of discrimination.  "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir. 1999).  "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group."  *Johnson v. Kroger Co.,* 319 F.3d 858, 865 (6th Cir. 2003).  "[A]n employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action."  *Weigel v. Baptist Hosp. of E. Tenn.,* 302 F.3d 367, 382 (6th Cir. 2002).  "Rather, the burden shifts

to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Id.*

After careful review of the record under the standards set forth above, I am unable to agree with Plaintiff's counsel's characterizations. I suggest that reminding a person, even repeatedly, that they are eligible for retirement, is not tantamount to threatening their discharge, nor can it be characterized as overt discrimination based upon age. The other remark which most closely resembles direct evidence is McKinstry's alleged statement, "I don't want you here, I'd fire you if I could." (Keesecker Aff. ¶ 4.) However, I suggest that this alleged statement is clearly insufficient to carry Plaintiff's preponderance-of-the-evidence burden, as it makes no mention of Plaintiff's age. Moreover, I am unwilling to suggest that any single remark made during a 12-year employment relationship, and possibly during a fit of pique, by a supervisor not himself capable of carrying through on the substance of that remark, is sufficient to justify a finding that Defendant acted with impermissible motive. I therefore suggest that Plaintiff's claims are not supported by direct evidence. As a result, I suggest that Plaintiff must make her case based upon circumstantial evidence under the burden-shifting standards set forth in *McDonnell Douglas*.

### ii. Circumstantial Evidence

Applying the *McDonnell Douglas* burden-shifting construct, as modified for age discrimination cases, I suggest at the outset that three of the four steps necessary to make out a prima facie age discrimination case are, on this record, essentially uncontested. By virtue of her age and because she is qualified for retirement, Plaintiff is clearly a member of a "protected class." Further, there is no question that Plaintiff's termination constitutes an "adverse employment action." Finally, the repeated notations in her employment records relating to her professional certification make it clear that Plaintiff is "qualified for the particular position."

Defendant argues, however, that the fourth and last step of the prima facie case is not met, as an older person was hired to replace Plaintiff.  Seeking to refute Plaintiff's allegations that Jody Winters, a younger woman, was Plaintiff's actual replacement, counsel for Defendant stated during oral argument that Winters was not hired until "long after the fact."  This argument, however, is undercut by Superintendent McKinstry's answers to Plaintiff's interrogatories, as well his deposition testimony.  In response to Interrogatory 11 propounded by Plaintiff, McKinstry cites a chart which indicates that an older woman initially filled the position, but she served less than a month, and then retired.  (Def.'s Ans. to Interrog., Dkt. 72 at Ex. 1.)   An older man then filled the position, but he served less than two months, and apparently was transferred to another school district.  (*Id.*.)  It was then that the younger employee, Jody Winters, was hired and she continues to hold Plaintiff's former position, at least through the date of McKinstry's interrogatory answers. In further contrast to counsel's characterizations, McKinstry himself during his deposition referred to these first two individuals as having been "hired in [*sic*] an interim basis because it takes quite a while to go through the hiring process."  (McKinstry Dep.,  Dkt. 70, Ex. 3 at 10.)[4]

Superintendent McKinstry's statements indicating that the first two people who occupied Plaintiff's former position were merely filling in while the hiring process was completed, viewed in a light most favorable to Plaintiff, support Plaintiff's assertion that Jody Winters was hired to be her replacement.  Accordingly, I suggest that the evidence as to the fourth prong is sufficient to establish a prima facie case of age discrimination.  Accordingly, Plaintiff receives the benefit of a presumption that Defendant unlawfully discriminated against her,  *see Burdine*, 450 U.S. at

---

[4]At a later point in his testimony, they are referred to as "replacements because they were social workers. . . ."  (*Id.*)

254, and the burden "shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* at 253 (quoting *McDonnell Douglas*, 411 U.S. at 802).

Defendant maintains that Plaintiff was discharged for "failure to exhibit sufficient progress with the March 15, 2002, Remediation Plan," for "unprofessional and/or insubordinate conduct," and for "failure to maintain a positive and efficient work environment." (Mot., Dkt. 62, Exs. L & M.) Presuming for the purposes of this analysis that these reasons are legitimate and nondiscriminatory within the meaning of *McDonnell Douglas*, Plaintiff argues that they nevertheless are pretext, and points to the fact that, after ten years of receiving the highest ratings available, being fully qualified, and potentially even over-qualified for her job, she finds that her employment relationship suddenly begins to unravel.

Plaintiff's work hours were unilaterally reduced from full-time to half-time. When she expressed her concern about the potential negative impact that this change might have upon the school district, as well as her own job, she was issued a written reprimand followed by an "administrative directive." Three months later, Plaintiff became eligible for retirement. Shortly thereafter, Plaintiff received a contract for the next year of her services reinstating her position to full-time, but that contract was taken from her before it could be signed, and a part-time contract issued. Plaintiff then received a new supervisor who at first was supportive of returning Plaintiff to a full-time position, but soon thereafter told Plaintiff that such efforts would be fruitless as they were opposed by Superintendent McKinstry.

Further, the evidence indicates that Plaintiff's job duties underwent a series of modifications which were not required of the person who replaced her. These changes included a series of "directives" and additional reporting requirements. Nine days after Defendant was notified that Plaintiff filed a charge of discrimination with the EEOC, Plaintiff was placed on administrative

leave and was denied, for at least some period of time, access to her own personnel file.   Finally, Plaintiff was terminated by the MCESA Board of Education at the request of Superintendent McKinstry, who allegedly had repeatedly reminded Plaintiff that she was old enough to retire.  An older employee initially filled Plaintiff's position, but she stayed on the job less than one month. Another older male employee was then hired who stayed on the job less than two months.  This was followed shortly thereafter by the hiring of a significantly younger employee, one not as qualified for the position as Plaintiff.

I suggest that the confluence of these facts, coming as they do in large measure at and after Plaintiff's eligibility for retirement, coupled with her ultimate replacement by a significantly younger and less-qualified replacement, can give rise to an inference of significant magnitude that the stated reasons for Plaintiff's termination are a pretext for age discrimination to deserve presentation to a finder of fact.  I therefore suggest that the denial of Defendant's motion for summary judgment with regard to Plaintiff's ADEA claim is appropriate.

### 3.  Equal Protection and Constructive Discharge Claims

At oral argument, counsel for Plaintiff raised two additional bases supporting denial of the instant motion.  First, counsel cited the constitutional interpretation laid out in *Ebelt v. County of Ogemaw*, 231 F. Supp. 2d 563 (E.D. Mich. 2002).  There, Judge Lawson stated:

> [T]his Circuit has . . . made it clear that statutory limitations on relief under Title VII do not diminish relief independently available under the Equal Protection Clause. *Day v. Wayne County Bd. of Auditors*, 749 F.2d 1199, 1204-05 (6th Cir. 1984). . . .
>
> Likewise, the Constitution protects citizens from retaliation by public officials for complaining about violations of their civil rights. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-84, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977). This protection from retaliation is independent from supplemental schemes established by Title VII and other remedial civil rights statutes. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 386-87 (6th Cir. 1999) (en banc).  Retaliation for filing an administrative complaint that is a predicate for suit violates the First Amendment.

> *See DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000) (holding that termination of prisoner's job in response to his filing of a grievance was unconstitutional retaliation for exercise his right of access to the Courts). More broadly, retaliation against a citizen for exercising her First Amendment rights in almost any circumstance violates the Constitution. *See McCurdy v. Montgomery County, Ohio*, 240 F.3d 512, 520 (6th Cir. 2001) (retaliation against plaintiff by police officer for the plaintiff's rude comments violated his First Amendment rights).

*Ebelt*, 231 F. Supp. 2d at 570.

I suggest that these principles could apply with equal force to the allegations made herein by this Plaintiff, whose employment was terminated by the MCESA, a public entity. Construing the facts in a light most favorable to Plaintiff, I suggest that in particular, the coincidences between the timing of unfavorable changes in the conditions of Plaintiff's employment and Plaintiff's expressions of concern made first to outside professional organizations, including her union, and later to the EEOC, can give rise to an independent cause of action under the Equal Protection Clause.

At oral argument, counsel for Plaintiff also contended that the facts of this case, as well as the legitimate inferences which can be drawn from those facts, give rise to a claim of constructive discharge. In this circuit, a constructive discharge claim requires that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 887 (6th Cir. 1996) (quoting *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)). However, even taking the facts in this case in the light most favorable to the non-movant, the record gives no indication that Plaintiff either resigned or quit. Rather, the record leaves no question that Plaintiff's employment was terminated by action of the MCESA Board. I therefore fail so see how Plaintiff could, on these facts, successfully advance a claim of constructive discharge.

### 4. Conclusions

After careful review of the record submitted by the parties, and taking the facts in the light most favorable to the non-moving party, I first suggest that Plaintiff has successfully advanced a prima facie case of age discrimination. Presuming Defendant's proffered reasons to be legitimate and non-discriminatory, I next suggest that Plaintiff's arguments relating to pretext could carry the day. I cannot say that the evidence on this issue is so one-sided as to preclude Plaintiff from the opportunity to present this argument to a trier of fact. Finally, I suggest that Plaintiff may have an independent equal protection claim under *Ebelt v. County of Ogemaw*, 231 F. Supp. 2d 563 (E.D. Mich. 2002). I therefore suggest that the denial of Defendant's motion for summary judgment is appropriate.

### III.   <u>REVIEW</u>

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*,

829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.


                              _s/ Charles E Binder_
                              CHARLES E. BINDER
Dated: October 20, 2004       United States Magistrate Judge




**CERTIFICATION**

       I hereby certify that this Report and Recommendation was electronically filed this date, and served on the following attorneys in the traditional manner: Victor J. Mastromarco, Jr., Mastromarco & Jahn, P. O. Box 3197, Saginaw, MI 48605-3197 and David A. Wallace, O'Neill, Wallace, P. O. Box 1966, Saginaw, MI 48605-1966.


Dated:  October 20, 2004            By____s/Jean L. Broucek_____
                                    Case Manager to Magistrate Judge Binder